UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **HORACE E. HOLLIS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **No. 3:17-cv-00626** |
| **v.** | ) | **Judge Trauger** |
| | ) | |
| **GRADY PERRY, Warden,** | ) | |
| | ) | |
| | ) | |
| **Respondent.** | | |

## MEMORANDUM

Horace E. Hollis, an inmate of the Hardeman County Correctional Facility in Whiteville, Tennessee, filed a pro se, in forma pauperis petition for writ of habeas corpus challenging his 2011 conviction and sentence for two counts of rape of a child and two counts of aggravated sexual battery. (Doc. No. 1). He filed an amended complaint with the permission of the court on December 1, 2017. (Doc. No. 29 at 33).

Presently pending before the court is the warden's response to the habeas petition (Doc. No. 22) as well as the petitioner's motion to reconsider the denial of his motion to appoint counsel (Doc. No. 30) and a motion to expedite proceedings (Doc. No. 31).

The petition is ripe for review, and this court has jurisdiction pursuant to 28 U.S.C. § 2241(d). Having fully considered the record, the court finds that an evidentiary hearing is not needed, and the petitioner is not entitled to relief. The petition therefore will be denied and this action will be dismissed.

## I.     Procedural History

In August 2001, the petitioner was charged in an eighty count presentment with forty counts of aggravated sexual battery and forty counts of rape of a child. The sexual abuse was

1

committed against the petitioner's two minor granddaughters by marriage and, based on the presentment, occurred every other weekend from October 2000 to July 2001. The counts in the presentment were identical except for the victims' names[1] and date range. Three separate attorneys represented the petitioner at trial. Before trial, the petitioner's third appointed counsel agreed to sever the counts of the indictment into separate groups of four, one count of rape of a child and one count of aggravated sexual battery for each of the two victims, theoretically resulting in twenty separate trials.

The petitioner was acquitted at his first trial. At his second trial, a Dickson County jury convicted the petitioner of two counts of rape of a child and two counts of aggravated sexual battery for offenses that occurred in June 2001. *State v. Hollis*, No. M2011-01463-CCA-R3-CD, 2012 WL 1867277, at *1 (Tenn. Crim. App. May 22, 2012). The trial court sentenced the petitioner to an effective sentence of forty years of imprisonment. *Id.* Following the trial, the State dismissed the remaining counts of the presentment. *Id.* On direct appeal, the Tennessee Court of Criminal Appeals affirmed the petitioner's convictions and sentence. *Id.* The petitioner did not appeal to the Supreme Court of Tennessee. *Id.*

The petitioner filed a timely pro se petition for post-conviction relief. *Hollis v. State*, No. M2013-01509-CCA-R3-PC, 2017 WL 588204, at *5 (Tenn. Crim. App. Feb. 14, 2017), *perm. app. denied* (Tenn. June 7, 2017). The post-conviction court appointed post-conviction counsel, who filed an amended petition for post-conviction relief. *Id.* Following an evidentiary hearing, the post-conviction court denied the petition. *Id.* at *8. The petitioner filed a timely notice of appeal, and the Tennessee Court of Criminal Appeals held that the petitioner had waived consideration of his issues on appeal. *Id.* at *1. The Tennessee Supreme Court vacated the

---

[1] Herein, because the victims were minors at the time of the crimes, the court will refer to the victims by their initials only: HLS and VMW.

appellate court's affirmance because the transcript of the post-conviction hearing was not included in the appellate record and remanded the case for full consideration with the complete and accurate record. *Id*. at *1 n.1. On the merits with the full record, the Tennessee Court of Criminal Appeals subsequently affirmed on February 14, 2017. *Id*. at *1. On June 7, 2017, the Tennessee Supreme denied discretionary review. *Id*. The petitioner filed a petition for a writ of certiorari in the United States Supreme Court on December 14, 2017. *Hollis v. Tennessee*, No. 17-7110 (Dec. 14, 2017), which was denied on February 20, 2018. *Id*.

The petitioner previously filed two habeas petitions in this district. *Hollis v. State of Tennessee, et al*., No. 3:10-cv-223 (M.D. Tenn. Mar. 4, 2010) (Sharp, J.) (Doc. No. 1); *Hollis v. Donahue*, No. 3:14-cv-2369 (M.D. Tenn. Dec. 14, 2014) (Campbell, J.) (Doc. No. 1). The court dismissed both petitions without prejudice for failure to exhaust state remedies. *Hollis*, No. 3:10-cv-223 (Doc. No. 59); *Hollis*, No. 3:14-cv-2369 (Doc. No. 13).

On March 15, 2017, the petitioner filed the instant pro se petition for writ of habeas corpus. (Doc. No. 1). Shortly thereafter, he filed a motion to hold his case in abeyance while he pursued further state court proceedings. (Doc. No. 4). By order entered on April 25, 2017, the court granted the petitioner's motion to stay and abey and directed the Clerk to administratively and temporarily close this file. (Doc. No. 5). The court directed the petitioner to file a motion to reinstate this case on the court's active docket promptly following the termination of the state-court post-conviction proceedings. (*Id*.)

The petitioner filed a motion to reopen the case on June 16, 2017, after having exhausted his state court remedies. (Doc. No. 6). By order entered on December 7, 2017, the court granted the petitioner's motion and directed the Clerk to administratively reopen this action. (Doc. No. 8).

In the same order, the court directed the respondent to file an answer, plead or otherwise respond to the petition in conformance with Habeas Rule 5. (*Id.*)

On December 7, 2017, the petitioner filed a motion for leave to amend the original petition "in order to show exhaustion of all state court remedies." (Doc. No. 9), which the court granted (Doc. No. 28).[2] The respondent filed a response on February 8, 2018, urging the court to dismiss the petition. (Doc. No. 22). The respondent concedes that the petition is timely. (Doc. No. 22 at 2). According to the respondent, some of the petitioner's claims are procedurally defaulted, and he cannot excuse the procedural defaults; each of the petitioner's properly exhausted claims for relief lacks merit because the state court decisions on these claims did not contradict or unreasonably apply clearly established federal law and were not based on unreasonable determinations of the established facts; and the petitioner alleges three non-cognizable claims. (*Id.* at 1-2).

In his petition, the petitioner asserts the following grounds for relief:

Claim 7: insufficiency of evidence to sustain the petitioner's conviction;

Claims 1(1) and 2(1): trial counsels' failure to litigate an alleged violation of the petitioner's right to a speedy trial;

Claim 2(3): trial counsel's failure to object to an alleged double jeopardy violation;

Claim 2(4): trial counsel's failure to object to alleged hearsay statements of witnesses Ross and Gomez;

Claim 2(5): trial counsel's failure to object to an alleged instance of prosecutorial misconduct;

Claim 2(6): trial counsel's failure to object to "unusual" timing of trial;

---

[2] The amended petition is identical to the original petition other than the added portion establishing the petitioner's complete exhaustion of state remedies.

Claim 2(7): trial counsel's failure to require the State to elect offenses prior to the case's submission to the jury at trial;

Claims 3(2) through 3(8): failures of appellate counsel;

Claim 1(3): trial counsels' failure to obtain the trucking log;

Claim 2(10): trial counsel's failure to investigate the law regarding speedy trial motions;

Claims 9 and 10: failures of post-conviction trial counsel and post-conviction appellate counsel;

Claims 1(2) and 2(8): trial counsel's failure to investigate and develop a defense strategy;

Claim 1(4): trial counsels' failure to challenge an alleged instance of prosecutorial misconduct;

Claim 2(9): trial counsel's failure to request funding for an expert witness;

Claims 3(1) and 3(9): appellate counsel's failure to consult with the petitioner regarding his appeal and a challenge to his conviction on actual innocence grounds;

Claim 2(2): trial counsel's failure to object to severance of the indictment;

Claims 4, 5, and 6: speedy trial, double jeopardy, and Confrontation Clause Claims; and

Claim 8: actual innocence. (Doc. No. 29).

## II.     Summary of the Evidence

### A.     Trial Proceedings

The Tennessee Court of Criminal Appeals summarized the proof adduced at the petitioner's jury trial as follows:

> Originally charged with 40 counts of aggravated sexual battery and 40 counts of rape of a child, the defendant was convicted of two counts of rape of a child and two counts of aggravated sexual battery for acts committed against VMW and HLS, the granddaughters of his ex-wife.1 Prior to trial, the State agreed to sever the 80–count indictment into groups of four based upon offense date. A Dickson

County Circuit Court jury acquitted the defendant of counts 77 through 80, the first four counts to go to trial. Counts 73 through 76 proceeded to trial in February 2011 and resulted in the convictions at issue in this appeal. Following the trial in this case, the remaining counts of the indictment were dismissed by the State.

Former Department of Children's Services ("DCS") case worker Veronica Gomez testified that she received a referral on August 1, 2001, and she arranged for the victims to be interviewed and examined at Our Kids Center. Ms. Gomez interviewed the girls herself on August 7, 2001. She said that during that interview, HLS "disclosed actual sexual penetration ... by the penis .... [i]nto the vaginal area," while VMW "only disclosed digital penetration." HLS told Ms. Gomez that the defendant put his penis "into her monkey all the way and it hurt." The girls indicated to Ms. Gomez that they were afraid of what their mother might say about the abuse.

Sue Ross, a pediatric nurse practitioner employed at Our Kids Center testified that she performed a physical examination of the victims on August 10, 2001. During the examination, HLS, who was six years old, disclosed that she had been sexually abused by the defendant, whom she called "Papa Buddy." HLS told Ms. Ross that the defendant had penetrated her vagina with his fingers and penis and that he had forced her to touch his penis. Ms. Ross characterized HLS's genital examination as normal. VMW, who was five years old at the time of the examination, reported to Ms. Ross that "Papa Buddy" "put his finger inside of her" and that he "put his private part on her belly button and said it felt like he was putting warm stuff on her tummy." According to Ms. Ross, VMW said that the defendant penetrated her vagina with his penis. A genital examination of VMW was normal.

Dickson County Sheriff's Department Detective B.J. Gafford was assigned to the case on August 2, 2001, and, after DCS interviews confirmed the girls' report of abuse, he obtained a warrant for the defendant's arrest on August 10, 2001. According to Detective Gafford, the defendant was not home when officers arrived at the defendant's residence, but the owner of the residence, the girls' grandmother, Helen Oney, gave them consent to search the residence. The defendant's belongings, including his necessary medications and clothing, were still in the residence. In the defendant's room, officers found children's toys and videos mingled with pornographic magazines.

During cross-examination, the detective acknowledged that he did not actually interview either of the girls because "they did not want

[him] in there while they were being interviewed by Ms. Gomez." Detective Gafford said that he did interview the victims' mother, who told him that the girls went to stay with Ms. Oney once a month and that the victims occasionally spent the night in the defendant's room when they visited Ms. Oney. He testified that he also interviewed Ms. Oney, who told him that she saw the girls "[a]pproximately every other week." Ms. Oney also told the detective that the defendant "would have little parties for [the victims] down there [in his room] and give them something to drink and candy and they would stay down there with him sometimes." Detective Gafford explained that the defendant rented the basement apartment of Ms. Oney's residence.

Tennessee Bureau of Investigation ("TBI") Agent Jeri Powell, who described himself as the special agent "in charge of the State Fugitive Center and Criminal Intelligent [sic] Unit," testified that Dickson County authorities asked the TBI to assist in locating the defendant on August 10. Agent Powell said that the TBI worked the case "over several months from the month of August until the month of April" and eventually located the defendant's rental car in Texas. The defendant was arrested in April 2002 "[w]orking for a carnival in Temple, Texas" under his own name.

The victim's grandmother and the defendant's ex-wife, Helen Oney, testified that after their divorce, the defendant began renting a room in her basement in October 2000. Ms. Oney and her third husband lived upstairs. Ms. Oney said that the victims spent every other weekend with her at her residence and that the defendant, who was an over-the-road truck driver, arranged his schedule so that he could "be there when they [were] there every other weekend." Ms. Oney recalled that the girls often went into the defendant's living quarters and that she "thought they [were] down there watching movies 'cause he was always renting movies." She said that the victims had toys and books in the defendant's living area and that the defendant brought the children presents. Ms. Oney recalled specifically that the victims were staying at her house on June 16 and 17, 2001, because that weekend was near HLS's birthday and the family gave her a party.

Ms. Oney testified that on August 1, 2001, the girls' mother telephoned her and told her "that she's at the hospital with [HLS] and [VMW] and they had been touch[ed by] ... 'their grandpa.'" The girls called the defendant "Papa Buddy." Ms. Oney said that the defendant, who was sitting next to her and overheard the conversation, "shook his head no" and "got up and left the room real quick." She recalled that by the time she got off the telephone, the

defendant had left the house and was headed "[u]p the driveway in his car." She said that she did not see him again but talked to him via telephone. During that conversation, Ms. Oney told the defendant that he was in trouble and should turn himself in to authorities, and he responded, "[N]o I'm not. I didn't do nothing."

During cross-examination, Ms. Oney said that she occasionally allowed the victims to spend the night with the defendant in his room and that the girls never acted strangely after doing so. Ms. Oney acknowledged that neither victim ever refused to visit her on the weekends or complained of genital pain or showed any other signs, such as bloody underwear, that they might be being sexually abused.

The victims' mother, Joyce West, testified that on August 1, 2001, HLS told her that the defendant had "touched her." Ms. West said that she "had a nervous breakdown" as a result of the disclosure, and then she telephoned police and her mother.

During cross examination, Ms. West maintained that the girls were not supposed to be around the defendant because she "knew something was going on but ... couldn't put [her] finger on it." She said that she allowed the girls to be around the defendant so long as she was with them.

HLS, who was 15 years old at the time of trial, testified that the defendant "would put his hand down [her] pants and put his fingers ... inside" her vagina. She said that she thought that the defendant did this "several" times in his basement room, but she could only remember "like maybe two times." She said that it hurt when he did it. HLS testified that the defendant told her that if she told anyone about the abuse, he would "kill everybody."

VMW, who was four years old at the time of the abuse, testified that she did not "really remember anything" but that the defendant's name "really upsets [her]." She had no memory at all of any abuse. She said that she had been going to counseling and "trying to bring up the memories" but that she did not "have any memories at all."

On the basis of this proof, the jury convicted the defendant as charged of two counts of aggravated sexual battery and two counts of rape of a child. The trial court attempted to merge the convictions of aggravated sexual battery into the convictions of rape of a child, but, for reasons discussed more fully below, the merger was ineffectual. Following a sentencing hearing, the trial court imposed a total effective sentence of 40 years' incarceration.

*State v. Hollis*, No. M2011-01463-CCA-R3-CD, 2012 WL 1867277, at **1-3 (Tenn. Crim. App. May 22, 2012).

**B.      Post-Conviction Proceedings**

The Tennessee Court of Criminal Appeals summarized the proof adduced at the petitioner's post-conviction evidentiary hearing as follows:

> A thorough review of the testimony at each of the Petitioner's trials is necessary for the disposition of this case. As an initial matter, prior to trial, third counsel agreed to re-label the numeric counts in the eighty (80) count presentment with letters of the alphabet such that it read Counts A, B, C, and D, rather than Counts 1, 2, 3, 4. At his first trial on August 24, 2010, the Petitioner was tried on Counts 77, 78, 79, and 80. The trial court preliminarily instructed the jury that in Count A of the indictment, the Petitioner was charged with aggravated sexual battery of granddaughter A between the dates of June 30, 2001, and July 1, 2001. In Count B, the trial court instructed the jury that the Petitioner was charged with rape of a child of the same victim between the same dates. In Count C, the trial court broadened the date range and instructed the jury that the Petitioner was charged with aggravated sexual battery of granddaughter B between June 30, 2001, and July 2, 2001. In Count D, the trial court advised that the Petitioner was charged with rape of a child of the same victim for the same dates.
>
> During its opening statement in the first trial, the State argued that it intended to prove that on June 30 and July 1, 2001, the Petitioner committed aggravated sexual battery and rape of a child against both granddaughters, who were five and four years old at the time of the offense. The State continued to explain that the victims would "come to Charlotte every weekend and stay at their grandmother's house, [victims' grandmother's name and her address]. [The victims] would come out on the weekends and during the week they lived home with their mother in Nashville." Detective Billy Joe Gafford was assigned to investigate the instant case based on a referral from Child Protective Services (CPS). He testified that on August 2, 2001, CPS had received a disclosure of "some type of abuse" by the Petitioner's granddaughters, and five days later, on August 7, the victims participated in recorded interviews conducted by CPS. Three days later, on August 10, 2001, Detective Gafford obtained a warrant for the Petitioner's arrest. On August 13, 2001, when Detective Gafford went to the Petitioner's home, a room he rented

in the basement of the home of his ex-wife and the victims' grandmother, the Petitioner was not there. Sometime later, after the Petitioner's lease had expired, the victims' grandmother gave Detective Gafford permission to search his basement room. During the search, Detective Gafford found children's toys and video games and a rental car agreement. After consulting with Kim Menke, the Assistant District Attorney (ADA) assigned to the case, Detective Gafford obtained "indictments" against the Petitioner and contacted other law enforcement agencies to assist him in searching for the Petitioner's whereabouts.

At the time the warrants were issued, the Petitioner worked for a Nashville trucking company. Detective Gafford later received information that the Petitioner was working for a carnival and eventually located the Petitioner in Temple, Texas. The Petitioner had been arrested, and Detective Gafford traveled to Texas to testify regarding the Petitioner's outstanding Tennessee arrest warrants. At some point not borne out at trial, the Petitioner was returned to Tennessee. In November 2009, the Petitioner was furloughed to the Veterans Affairs (VA) hospital in Nashville for medical reasons.

On cross-examination, Detective Gafford acknowledged that the Petitioner was not aware of any pending investigation at the time he left, when the warrants were issued. Detective Gafford also never personally interviewed the victims. Detective Gafford acknowledged that he was first notified of the offense on August 2 but that his affidavit of complaint showed that he had been contacted on July 31. A bench conference then occurred during which the prosecutor advised the court that if defense counsel continued this line of questioning, then Detective Gafford "could end up testifying to some dates that would show other counts of the indictment." Defense counsel replied, "that date is not even in the indictment ... this is well after the indictment." The prosecutor then replied, "Well, I don't know what all she is going to ask and that's fine, but I just wanted to again take the chance to warn Detective Gafford that we're in this gray area here because he only got two arrest warrants and there ended up being an 80 count indictment[.]" After being cautioned by the trial court, defense counsel continued questioning Detective Gafford, who agreed that his affidavit was dated on the same day that the allegation occurred. Detective Gafford clarified that he was contacted or notified of the offense on August 2, and that the listed date on the affidavit was a clerical error. His affidavit was admitted into evidence. He agreed that the facts as contained in his affidavit regarding the victims' statements of sexual abuse were consistent with their recorded statements given to CPS. He agreed that the victims did not provide dates for the offenses.

The victims' grandmother, who was also the Petitioner's ex-wife, testified that the Petitioner, nicknamed "Buddy," lived in the basement of her home to help defer the house payment. She said that the victims were her granddaughters and, at the time of trial, were fourteen and fifteen years old. In June and July of 2001, the victims lived in Nashville with their mother but tried to visit her every weekend. She would pick them up from Nashville every weekend except for when she had to work. Asked if she picked them up or if they visited her on June 30 or July 1, 2001, she replied, "I did not." She explained that she did not pick them up on the dates alleged in the presentment because she had to work. She said, "They came up there. It had to be on a Sunday and they wouldn't have stayed very long because my daughter's boyfriend would have brought them up there." Her home had three floors: an upstairs, middle floor, and downstairs. The victims had their own bedroom on the middle floor at their grandmother's home. Asked who watched the victims when she was at work, the grandmother said her current husband. Although the Petitioner was "around" the victims upstairs, he was not permitted to "watch after" the victims.

On the day the victims disclosed the sexual abuse, the grandmother was notified of the sexual abuse by a phone call from her daughter. When she received the phone call, the Petitioner was in the room and overheard the conversation. Five minutes after the phone call, the Petitioner left the grandmother's home and never returned. The grandmother did not enter the Petitioner's room until the police arrived. She did not know that the girls had gone into the Petitioner's room to watch movies. She later received a phone call from the Petitioner and urged him to turn himself in to the police but he said, "no." She recalled that at the time of the offense, the Petitioner was working for a trucking company. She said that he was driving a truck and would "come in for about two or three days a month and that's the reason why we let him stay there because we wouldn't see him very much." She confirmed on cross-examination that the victims were not with her on the weekend of June 30. She also said that although the victims were not allowed to be alone with the Petitioner, the victims "went [to his basement apartment], and you know, spent the night with him." When pressed to recall whether the Petitioner was present on the weekend of June 30, the grandmother replied, "I'm trying to think. I can't put a day on it but I just know he comes in ... three days [ ] a month and that was it."

Victim A was fifteen years old and lived with her grandmother at the time of trial. In 2001, when she was five or six years old, she lived in Nashville with her mother but visited her grandmother in

Dickson every weekend. Victim A said her grandmother would pick her up from Nashville, or they would meet her grandmother at her office in Nashville. She said she visited her grandmother every weekend for "about a year or two." In 2001, she shared a bedroom on the second floor of her grandmother's home with her sister, Victim B, who was fourteen years old at the time of trial. She confirmed that the Petitioner lived in the basement during that time. In regards to the offense, Victim A said that the Petitioner "would touch us ... he would put his hands down my pants and he would put his—he would make us—he would always put his finger inside of [her vagina] and I can't remember that much." She said that the offense occurred at her grandmother's home in the Petitioner's room. She said that he would offer candy and toys to her sister and her if they came to his room. Asked if there was ever a time when you and your sister were both in the same room with the Petitioner, Victim A replied, "Yes." The Petitioner showed the victims his penis. Victim A further testified that the Petitioner told her that "if we told anyone that he would kill the people that we told."

On cross-examination, Victim A was asked if she remembered any dates of the offenses. She replied, "I can't remember the exact year but I remember the date. It was July 5." She said the Petitioner would always put his finger inside of her vagina at night while her grandmother was asleep upstairs. She first disclosed the abuse to her paternal grandmother.

Victim B testified that she was fourteen years old and lived with her mother in Antioch at the time of trial. Victim B could not recall the Petitioner's name, but knew that someone lived in her grandmother's basement in 2001. She could not remember anything about the Petitioner and did not recall making a disclosure of sexual abuse. She said she was currently undergoing counseling "because of what happened." She testified that her therapists "help her block it out." When pressed about her interaction with the person who lived downstairs, the victim said that "he just asked me and my sister did we want to stay downstairs." She remembered following her sister downstairs, staying in his room, and him telling her that "if we ever told anybody he would kill whoever we told." Victim B said that it "hurt her head" when she tried to remember and that the therapists were helping her to block it out so she would not have nightmares.

At the request of the State in December 2009, Captain Jim Webb of the Dickson County Sheriff's Department was searching for the Petitioner. Captain Webb located the Petitioner at the Salvation Army Rescue Mission in Nashville. Captain Webb explained that the Petitioner had been dropped off at the VA hospital by an

Assistant Public Defender (APD), but never checked in. The hospital "would not divulge any records of [the Petitioner] ever being there" to Captain Webb. The Petitioner was at large for "a few days short of a month." Following the close of the State's proof, an affidavit from an APD was admitted into evidence by stipulation. The affidavit concerned the Petitioner's visit to the VA in December 2009, and his failure to return to the Dickson County jail. The affidavit stated that the APD transported the Petitioner, who was confined to a wheelchair, to the VA by order of the court. The APD opined that the Petitioner was unable to stand or walk without assistance. The Petitioner was provided with a copy of the trial court's order requiring him to return to the jail if he was not admitted to the hospital and the phone number to the Public Defender's Office in Ashland City. After waiting some time for the hospital administration to locate the Petitioner's records, the APD was advised that it would take another two to two and a half hours before a physician could see the Petitioner and complete the admission process. The APD was unable to wait for the Petitioner to be seen and left the Petitioner at the hospital. Significantly, the APD did not return to his office until some days later. Upon his return, he listened to an urgent message from the Petitioner advising that he was still at the hospital, he had seen a physician, and that the hospital refused to admit him. The Petitioner did not know what to do and did not have the means to return to the jail. The Petitioner requested the APD to come and pick him up from the hospital. After receiving the message, the APD called the hospital but was unable to obtain any information about the Petitioner. The victims' medical records from Our Kids Center were also admitted into evidence by stipulation and published to the jury.

During the state's closing argument, the prosecutor briefly urged the jury to read the contents of the exhibits, the affidavit of complaint, the victims' statements, and the victims' medical records. Their argument otherwise focused on the Petitioner's flight from custody, which they argued was indicative of his guilt. The State's argument did not specifically reference the testimony upon which they were relying to support convicting the Petitioner. In response, the defense's closing argument focused on the fact that the Petitioner was not charged with flight or escape, that the Petitioner did not know any investigation was pending at the time he left in 2001; and that the affidavit from the APD showed that he tried to call back the APD because he did not have a ride back to the jail. Defense counsel also argued that the grandmother testified that the victims were not at her home on the dates alleged in the presentment. She claimed that the victims were there on one day and only for a couple of hours.

Finally, defense counsel argued that the victims' medical records did not show any injury and reflected a normal exam result.

Based on the above proof, the jury acquitted the Petitioner on all four counts of the presentment.

A full recitation of the testimony presented at the Petitioner's second trial, which occurred on February 4, 2011, is detailed in this court's opinion on direct appeal. *See State v. Horace Hollis*, No. M2011–01463–CCA–R3–CD, 2012 WL 1867277, * 1–3 (Tenn. Crim. App. May 22, 2012). In the second trial, the State proceeded on Counts 73, 74, 75, and 76, which alleged that on June 16, 2001, and June 17, 2001, the Petitioner committed the same sexual offenses as outlined above against his granddaughters. Except for the testimony of Sue Ross, Veronica Gomez, the victims' mother, and an agent from the Tennessee Bureau of Investigation (TBI), the proof at the second trial was substantially the same as the first trial. We recount only the facts, as stated in our direct appeal, that are pertinent to the issues raised in the petition for post-conviction relief.

> Former Department of Children's Services ("DCS") case worker Veronica Gomez testified that she received a referral on August 1, 2001, and she arranged for the victims to be interviewed and examined at Our Kids Center. Ms. Gomez interviewed the girls herself on August 7, 2001. She said that during that interview, [Victim A] "disclosed actual sexual penetration ... by the penis ... [i]nto the vaginal area," while [Victim B] "only disclosed digital penetration." [Victim A] told Ms. Gomez that the [Petitioner] put his penis "into her monkey all the way and it hurt." The girls indicated to Ms. Gomez that they were afraid of what their mother might say about the abuse.

> Sue Ross, a pediatric nurse practitioner employed at Our Kids Center testified that she performed a physical examination of the victims on August 10, 2001. During the examination, [Victim A], who was six years old, disclosed that she had been sexually abused by the [Petitioner], whom she called "Papa Buddy." [Victim A] told Ms. Ross that the [Petitioner] had penetrated her vagina with his fingers and penis and that he had forced her to touch his penis. Ms. Ross characterized [Victim A's] genital examination as normal. [Victim B], who was

five years old at the time of the examination, reported to Ms. Ross that "Papa Buddy" "put his finger inside of her" and that he "put his private part on her belly button and said it felt like he was putting warm stuff on her tummy." According to Ms. Ross, [Victim B] said that the [Petitioner] penetrated her vagina with his penis. A genital examination of [Victim B] was normal.

The victims' grandmother and [the Petitioner's] ex-wife, [ ], testified that after their divorce, [the Petitioner] began renting a room in her basement in October 2000. [The victims' grandmother] and her third husband lived upstairs. [The victims' grandmother] said that the victims spent every other weekend with her at her residence and that [the Petitioner], who was an over-the-road truck driver, arranged his schedule so that he could "be there when they [were] there every other weekend." [The victims' grandmother] recalled that the girls often went into [the Petitioner's] living quarters and that she "thought they [were] down there watching movies 'cause he was always renting movies.'" She said that the victims had toys and books in the [Petitioner's] living area and that the [Petitioner] brought the children presents. [The victims' grandmother] recalled specifically that the victims were staying at her house on June 16 and 17, 2001, because that weekend was near [Victim A's] birthday and the family gave her a party.

During cross-examination, [the victims' grandmother] said that she occasionally allowed the victims to spend the night with the [Petitioner] in his room and that the girls never acted strangely after doing so. [The victims' grandmother] acknowledged that neither victim ever refused to visit her on the weekends or complained of genital pain or showed any other signs, such as bloody underwear, that they might be being sexually abused.

The victims' mother, [ ], testified that on August 1, 2001, [Victim A] told her that the [Petitioner] had "touched her." [The victims' mother] said that she "had a nervous breakdown" as a result of the

disclosure, and then she telephoned police and her mother.

During cross examination, [the victims' mother] maintained that the girls were not supposed to be around [the Petitioner] because she "knew something was going on but ... couldn't put [her] finger on it." She said that she allowed the girls to be around the [Petitioner] so long as she was with them.

[Victim A], who was 15 years old at the time of trial, testified that the [Petitioner] "would put his hand down [her] pants and put his fingers ... inside" her vagina. She said that she thought that the [Petitioner] did this "several" times in his basement room, but she could only remember "like maybe two times." She said that it hurt when he did it. [Victim A] testified that the [Petitioner] told her that if she told anyone about the abuse, he would "kill everybody."

[Victim B], who was four years old at the time of the abuse, testified that she did not "really remember anything" but that the [Petitioner's] name "really upsets [her]." She had no memory at all of any abuse. She said that she had been going to counseling and "trying to bring up the memories" but that she did not "have any memories at all."

Based on the above proof, the jury convicted the Petitioner of two counts of rape of a child and two counts of aggravated sexual battery, for which he received an effective sentence of forty years' imprisonment. The Petitioner appealed his convictions to this court challenging only the sufficiency of the convicting evidence. His convictions were affirmed by this court; however, we remanded for entry of corrected judgments. *See Horace Hollis*, 2012 WL 1867277, at *1–4. The Petitioner did not seek further direct review of his convictions from the Tennessee Supreme Court. On December 10, 2012, the Petitioner filed a timely pro se petition for post-conviction relief alleging numerous claims of ineffective assistance of counsel as well as other grounds for relief. Following the appointment of counsel, the Petitioner filed an amended post-conviction petition.

At the April 23, 2013 post-conviction hearing, first counsel, the Public Defender for the Twenty–Third Judicial District, testified that he and two other attorneys from his office were originally

appointed to represent the Petitioner. First counsel personally interviewed the Petitioner and discussed the length of time the Petitioner had spent in custody in Texas. At that point, the Petitioner "wanted to go ahead and face the [instant] charges" and advised first counsel to seek and obtain the Petitioner's work records in order to pursue an alibi defense. The work records purportedly showed that "during many of the periods [the Petitioner] was indicted or under presentment," the Petitioner was "out on the road and not even [in Dickson County]." First counsel contacted the Petitioner's employer but was unable to obtain the work records because they were "disposed of" during the period of time that the Petitioner was in federal prison and before he was brought back to Tennessee. Although first counsel could not recall whether anyone in his office actually filed a motion for speedy trial, he researched the issue, discussed it with the Petitioner, and intended to pursue it.

First counsel believed the inability to obtain the Petitioner's work records was "a severe detriment to [the Petitioner's] defense" primarily because witness memories had faded with the passage of time. First counsel generally discussed the difference between questioning a child witness and a teenage witness, and the impact a delay in prosecution would have on both. On cross-examination, first counsel confirmed that the Petitioner was charged by affidavit of complaint with two counts of aggravated sexual battery and two counts of rape of a child on or about July 31, 2001, and that the warrant was sworn out on August 10, 2001. He did not have personal knowledge of the Petitioner's flight from Tennessee but had reviewed similar information in his file. Specifically, he reviewed an August 17, 2001, TBI report contained in pre-trial discovery showing that the TBI had contacted the Petitioner's employer to obtain his work records, but first counsel could not confirm the substance of the report. He agreed that if the Petitioner's employer was unable to provide the Petitioner's work records to the TBI in 2001, his employer would not have been able to provide the work records to the defense when they were later appointed in 2009. First counsel confirmed that "as [the Petitioner travel[ed] around," he worked under various "alias names," but first counsel did not know the specific names or how many different names the Petitioner used.

On March 8, 2010, first counsel's office was removed from the Petitioner's case based on a conflict. First counsel explained the circumstances in which his office withdrew from representing the Petitioner. In 2009, when the Petitioner was brought back to Tennessee, the defense entered an agreement with the District Attorney's Office to send the Petitioner to the VA hospital. On November 5, 2009, an escape warrant was issued for the Petitioner

because he left the VA hospital and did not return to the Dickson County jail as required. According to first counsel, the Petitioner called his office and advised that he was not able to be admitted to the hospital, and they were unable to locate him after that.

Although she could not recall the specific dates, second counsel also worked on the Petitioner's case and left the Public Defender's Office while the Petitioner's case was "still pending." She met with the Petitioner, began gathering records, and prepared his case for trial. She acknowledged that he was facing an eighty count presentment for offenses which occurred in the "early 2000's" and that there was "quite a bit of time between his indictment and when he came back [ ] to Tennessee to stand trial." Second counsel talked with the Petitioner about the speedy trial issue and whether his extradition from Texas was done properly. The Petitioner told second counsel that he had waived extradition to Tennessee "in the early 2000's." However, counsel explained that the Petitioner was also facing federal charges in Texas at the time that he waived extradition. She said ADA Kim Menke was handling the Petitioner's case at that time. Second counsel never worked with ADA Menke because he had passed away by the time she became involved in the Petitioner's case. She did not file any motions on the Petitioner's behalf.

Third counsel, who represented the Petitioner at his first and second trials, was appointed to represent the Petitioner in 2010. When third counsel was appointed, the Petitioner was facing an additional offense of escape. She became familiar with the charges, reviewed the existing court file, and received the file from the Public Defender's Office. She discussed the delay between the presentment and trial with the Petitioner, who had expressed concern regarding the issue. She did not file a motion for speedy trial "based on the fact there were pending charges against [the Petitioner] for escape [and] because it would have been frivolous." Asked the substance of her conversation with the State regarding "the trying of only certain counts of the indictment at one time," third counsel replied, "It was the district attorney and the judge and that was what the agreement was. We would do four at a time." In response to whether she had done any research on the issue, she replied, "Strategically, I felt it was the best way to proceed." She further opined that "if a jury heard that [the Petitioner] was on trial for 80 counts they might consider that in and of itself that he was guilty hearing that many at once." Her defense strategy in this regard did not change after she heard the testimony of the child victims in the first trial. Third counsel acknowledged that the social worker and the nurse practitioner did not testify at the first trial; nevertheless, she had "very thoroughly" reviewed the documentation supplied by them in

discovery. She acknowledged that she did not file a motion in limine to exclude all or portions of their testimony and did not object to any of their testimony during the Petitioner's first or second trial.

Third counsel further acknowledged that she did not object to certain testimony from Detective Gafford, and she did not know why she did not object. She did not file a motion in limine to exclude evidence gathered from the Petitioner's rented room. She agreed that neither child victim provided a time frame for the offenses during trial and opined it was because they were too young. She did not ask the trial court to require the State to elect or narrow down what offenses they were submitting to the jury at the close of the State's case or object based on double jeopardy principles after the acquittal in the first trial. In third counsel's view, there was not a double jeopardy concern because the rapes occurred on different dates. She contacted the Petitioner's employer to obtain his work records, but his employer was unable to provide any.

Asked about the Petitioner's flight from Tennessee in 2001, third counsel said that she did not consider it to be flight because the Petitioner told her that he did not know there were any allegations or charges at that time. She confirmed that the Petitioner left Tennessee and was arrested in Texas for possession of firearms. She also agreed that he was convicted in federal court and sentenced to twelve years' imprisonment. Finally, she agreed that the Petitioner was serving this twelve-year sentence when he was brought back to Tennessee in 2008.

Detective B.J. Gafford of the Dickson County Sheriff's Department testified that in early 2000, he traveled to Texas twice because he was subpoenaed to testify in federal court. Although Detective Gafford was unsure whether the Petitioner was in federal or state custody, he knew the Petitioner was somewhere in Texas. Detective Gafford inquired to ADA Menke about the Petitioner's case and was advised that the Petitioner would not be coming back to Tennessee anytime soon for trial. Detective Gafford confirmed that the Petitioner was in Texas because he fled Tennessee prior to his indictment. He also confirmed that the Petitioner was charged with escape while he was awaiting trial.

Post-conviction counsel admitted by stipulation with the State a copy of the Petitioner's waiver of extradition and a January 31, 2003, letter from an Assistant U.S. Attorney to ADA Menke. Based on the waiver of extradition, the Petitioner voluntarily waived his rights to extradition and consented to return to Tennessee on April 4, 2002. He further consented to remain in Texas custody until transfer to

Tennessee was arranged. An Assistant U.S. Attorney penned the January 2003 letter, which forwarded "materials" from the Petitioner's federal trial to the state's attorney, ADA Menke. The record also contains an April 20, 2006, detention facility form showing that the Petitioner inquired as to whether there was a detainer lodged against him. The detention facility replied in the negative.

In closing, post-conviction counsel argued that the Petitioner's extradition was flawed because the State knew of his whereabouts as early as 2002 and did nothing until 2008, when he was released from federal custody and brought back to Tennessee. He also argued that "the other two issues are kind of intertwined and ... complicated on this election of remedies and the double jeopardy issue." He argued that "at no time did anyone ever pin down any dates regarding the alleged incidents that were testified to [at trial]. No testimony, no evidence was presented to the Court, no testimony to the Court ... regarding any time frame whatsoever." Post-conviction counsel argued that "the failure to raise this issue with the court after the second trial insofar as the first trial was concerned and certainly after the close of the proof in the second trial" amounted to ineffective assistance of counsel. He then argued that the Petitioner was, in fact, "put to trial twice [in violation of principles of double jeopardy] because the general not guilty verdict in the first trial covered everything." The State waived argument.

In denying relief, the post-conviction court issued a thirty-four-page "Memorandum Opinion on Petition for Post–Conviction Relief," which considered each of the Petitioner's claims and summarized the evidence adduced at the evidentiary hearing. In brief, the court concluded that the Petitioner had failed to meet his burden in proving his factual allegations by clear and convincing evidence. It is from this order that the Petitioner appeals.

*Hollis v. State*, No. M2013-01509-CCA-R3-PC, 2017 WL 588204, at **1-8 (Tenn. Crim. App. Feb. 14, 2017).

## III.     Standard of Review

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act

of 1996 ("AEDPA"). The AEDPA was enacted "to reduce delays in the execution of state and

federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (internal citations and quotation marks omitted). As the Supreme Court explained, the AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). The AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id*.

One of the AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S.C. § 2254(d). Under the AEDPA, the court may grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

The state court's factual findings are presumed to be correct, and they can be contravened only if the petitioner can show by clear and convincing evidence that the state court's factual findings were erroneous. 28 U.S.C. § 2254(e)(1). State-court factual findings are "only unreasonable where they are 'rebutted by clear and convincing evidence' and do not have support in the record." *Moritz v. Woods*, 692 Fed. App'x 249, 254 (6th Cir. 2017) (quoting *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017) (internal quotation marks omitted)). As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a

substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). Review under § 2254(d) (1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Id.* (citation omitted); *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996) (the substance of the claim must have been presented as a federal constitutional claim). This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509, 522 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *See Picard v. Connor*, 404 U.S. 270, 275 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review").

Claims which are not exhausted are procedurally defaulted and "ordinarily may not be considered by a federal court on habeas review." *Alley v. Bell*, 307 F.3d 380, 388 (6th Cir. 2002). Procedural default also occurs where the state court "actually . . . relie[s] on [a state] procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985). To cause a procedural default, the state court's ruling must "rest[ ] on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman*, 501 U.S. at 729.

"In order to gain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate cause and prejudice for the failure, or that a miscarriage of justice will result from the lack of review." *Alley,* 307 F.3d at 386. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman v. Thompson*, 501 U.S. 722, 754 (1991)). A petitioner may establish cause by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. *Id.* Constitutionally ineffective assistance of trial or appellate counsel may constitute cause. *Murray*, 477 U.S. at 488–89. Generally, however, if a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself have been presented to the state courts as an independent claim before it may be used to establish cause. *Id*. If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim. *Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000).

Petitioners in Tennessee also can establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim in initial review post-conviction proceedings. *See Martinez v. Ryan*, 566 U.S. 1, 5-6 (2012) (creating an exception to *Coleman* where state law prohibits ineffective assistance claims on direct appeal); *Trevino v. Thaler*, 569 U.S. 413, 429 (2013) (extending *Martinez* to states with procedural frameworks that make meaningful opportunity to raise ineffective assistance claim on direct appeal unlikely); *Sutton v. Carpenter*,

745 F.3d 787, 792 (6th Cir. 2014) (holding that *Martinez* and *Trevino* apply in Tennessee). The Supreme Court's creation in *Martinez* of a narrow exception to the procedural default bar stemmed from the recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Martinez*, 566 U.S. at 13. In other words, *Martinez* requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *See id*. at 13-15. Importantly, *Martinez* did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in *Coleman*.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court also has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 496).

## IV.     Analysis

With these principles in mind, the court will turn to the examination of the claims raised in Hollis's amended petition for habeas relief.

### A.     Claim 7:  Sufficiency of the Evidence

The petitioner alleges that the evidence was insufficient to sustain his convictions.  (Doc. No. 29 at 21).  The respondent concedes this claim is properly exhausted.  (Doc. No. 22 at 21-22). The Tennessee Court of Criminal Appeals considered the petitioner's sufficiency of evidence claims.    Therefore,  this  court  must  presume  the  correctness  of  the  state  court's  factual determinations.  28 U.S.C. § 2254(e)(1).  The petitioner may rebut this presumption only with clear and convincing evidence.  *Warren v. Smith*, 161 F.3d 358, 360-61 (6ᵗʰ Cir. 1998).

On sufficiency of the evidence challenges, habeas relief is warranted "only where the court finds, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008) (internal quotation omitted); *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ("Instead, the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.") (emphasis in original).

The petitioner alleges that the "evidence adduced at trial was not sufficient to prove guilt beyond a reasonable doubt." (Doc. No. 29 at 21).  He points out that VMW testified she did not have any memory of anything that happened in 2001 and HLS's testimony was inconsistent about the number of times the alleged abuse occurred.  (*Id*. at 21-22)  He alleges that the forensic medical examinations of VMW and HLS were "normal."  (*Id*. at 22).

In considering the petitioner's insufficiency of evidence claims in its opinion, the

Tennessee Court of Criminal Appeals began by setting forth the correct legal standard:

> We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

> When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

*State v. Hollis*, 2012 WL 1867277, at **3-4. The court then considered the definition of the crimes

under state law and the evidence supporting the crimes as to each victim:

> Rape of a child is defined as the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." *Id.* § 39-13-501(7).

> Aggravated sexual battery, as relevant to this case, is the "unlawful sexual contact with a victim by the defendant or the defendant by a victim [when] . . . [t]he victim is less than thirteen (13) years of age." *Id.* § 39-13-504(a)(4). "Sexual contact" is "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, . . . if that intentional touching can be

reasonably construed as being for the purpose of sexual arousal or gratification." *Id*. § 39-13-501(6). Additionally, "'[i]ntimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." *Id*. § 39-13-501(2).

Although admittedly not overwhelming, the proof adduced at trial sufficiently supports each of the defendant's convictions. Ms. Ross testified that HLS told her that the defendant penetrated her vagina with his fingers and that he had forced her to touch his penis. VMW reported to Ms. Ross that the defendant "put his finger inside of her" and that he "put his private part on her belly button and said it felt like he was putting warm stuff on her tummy." Both girls made similar disclosures to Ms. Gomez. Although this evidence may have been excludable as hearsay, the defendant made no objection to its admission. Thus, the jury was free to consider it as substantive evidence of the defendant's guilt. *See State v. Smith*, 24 S.W.3d 274 (Tenn. 2000). With regard to the convictions involving HLS, she confirmed at trial that the defendant had placed his hand inside her pants and penetrated her vagina with his finger. In consequence, we affirm the convictions.

*State v. Hollis*, 2012 WL 1867277, at *4. The appellate court ultimately concluded that, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crimes. The respondent urges that this conclusion was not an unreasonable determination of the facts or an unreasonable application of the law.

To convict the petitioner of rape of a child, the State had to prove beyond a reasonable doubt that the petitioner engaged in "sexual penetration" of a victim who was more than three years of age but less than thirteen years of age. Tenn. Code Ann. § 39-13-522(a). Under Tennessee law, "sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." *Id*. § 39-13-501(7).

At trial, the State introduced the testimony of Sue Ross, who stated the HLS, when she was six years old, told Ross that the defendant had placed his hand inside her pants and penetrated her vagina with his finger and that he had forced her to touch his penis. Ross testified that VMW had told her that, when she was four or five years old, the defendant "put his fingers inside of her" and that he "put his private part on her belly button and said it felt like he was putting warm stuff on her tummy." While Ross testified that both girls' physical examinations were normal, Ross explained that it is very unusual to see any sort of specific injury from the conduct HLS reported and, in fact, eighty-five to ninety percent of children examined by Our Kids have a normal examination. The State also introduced the testimony of Ms. Gomez, who stated that both girls made similar disclosures to her in August 2001.

At trial, fifteen-year-old HLS testified that, in 2001, when she was six years old, she would stay with her grandmother every weekend, and the defendant would put his hands down her pants and put his finger inside of her vagina on the bed in the defendant's room at her grandmother's house. HLS testified that she never told anyone what happened because the defendant threatened to kill everybody if she told anyone. VMW, who was fourteen-years-old at the time of the trial, testified that she did not have any memories from 2001, she was currently going to counseling "because of what happened," and her therapists "help her block it out" to stop her from having nightmares. *Hollis*, 2012 WL 1867277, at *3. She remembered the defendant telling her that if she and her sister ever told anybody he would kill whoever we told. She said it "hurt her head" when she tried to remember. *Id*.

The victims' grandmother testified that HLS and VMW were present in her house on June 16-17, 2001, because she remembered having a birthday party for one of the victims. The grandmother also testified that the petitioner arranged his schedule so he was present in the house

when the victims were visiting.  The mother testified that she did not permit the girls to stay at her mother's house when the defendant was present.  Defense counsel argued that the defendant was out of town on the dates of the alleged offenses.

The jury was entitled to credit the testimony of the State's witnesses and discredit the defendant's theory that he was not present on the dates in question and did not commit the offenses. "On a state prisoner's habeas petition challenging the insufficiency of the evidence," such as in the instant case, the court "must draw all available inferences and resolve all credibility issues in favor of the jury's verdict." *Rodriguez v. Trombley*, No. 2:06-cv-11795, 2010 WL 120222, at *14 (E.D. Mich. Jan. 8, 2010). Because "[a]ttacks on witness credibility are simply challenges to the quality of the prosecution's evidence, and not to the sufficiency of the evidence," *id*. at *15, an assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (on habeas review, a federal court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor was observed at trial).  A habeas court must defer to the fact finder for its assessment of the credibility of witnesses. *Matthews v. Abramajtys*, 319 F.3d 780, 788-89 (6th Cir. 2003).

Although the defendant could have objected to the testimony of Ross and Gomez as hearsay, the defendant failed to make such an objection.  Thus, as the appellate court determined, the jury was free to consider the testimony of both witnesses as evidence of the defendant's guilt.

When viewing the evidence in the light most favorable to the prosecution, the court finds that the State introduced more than sufficient evidence for a rational juror to conclude beyond a reasonable doubt that the petitioner committed rape of a child and aggravated sexual battery as to HLS and VMW, both of whom were above the age of three and below the age of thirteen at the time of the offenses.  "[P]hysical evidence is not a prerequisite to sustaining a conviction." *United*

*States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010). The court finds that the Tennessee Court of Criminal Appeals' decision was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Furthermore, given the evidence and testimony adduced at trial, the court finds that the state court's decision to reject the petitioner's insufficiency of evidence claim was not an unreasonable application of the law. The appellate court correctly cited the applicable federal standard of review from *Jackson v. Virginia* and reasonably decided the claim against the petitioner. The petitioner therefore is not entitled to habeas relief on this claim.

**B.      Ineffective Assistance of Counsel Claims**

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right of a person accused of a crime to the effective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Bell v. Cone*, 535 U.S. 685, 694-95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 686-87; *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000), *cert. denied*, 531 U.S. 1035 (2000). In assessing performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. Reasonable attorneys may disagree on the appropriate strategy for defending a client. *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004). The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

A court hearing an ineffective assistance of counsel claim must consider the totality of the evidence. *Strickland*, 466 U.S. at 695. "The determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'" *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (quoting *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689.

As discussed above, federal habeas relief may not be granted under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision "was contrary to" federal law then clearly established in the holding of the United States Supreme Court, § 2254(d)(1); that it "involved an unreasonable application of" such law; or that it "was based on an unreasonable determination of the facts" in light of the record before the state court.  28 U.S.C. § 2254(d)(1),(2).  Thus, when a claim of ineffective assistance of counsel is raised in a federal habeas petition, such as here, the question to be resolved is not whether the petitioner's counsel was ineffective.  Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  As the Supreme Court clarified in *Harrington*:

> This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under

AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington*, 562 U.S. at 101 (internal quotation marks and citation omitted).

### 1.     Claims 1(1) and 2(1):  Trial counsels' failure to litigate an alleged violation of the petitioner's right to a speedy trial

The petitioner claims that his trial attorneys were constitutionally ineffective because they failed to litigate an alleged violation of the petitioner's right to a speedy trial.  (Doc. No. 29 at 7). In evaluating this claim, the Tennessee Court of Criminal Appeals applied the governing legal standard for claims of ineffective assistance of counsel:

> In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. *Vaughn*, 202 S.W.3d at 116 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell below an objective standard of reasonableness under prevailing professional norms. *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter*, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*. at 370 (quoting *Strickland*, 466 U.S. at 694). Moreover,
>
> > [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.
>
> *Id*. at 370 (citing *Strickland*, 466 U.S. at 697).

*Hollis*, 2017 WL 588204, at **8-9.

Applying the law to the facts of the petitioner's case, the appellate court considered the length of the delay, the reason for the delay, the defendant's assertion of the right to a speedy trial, and prejudice to the defendant as a result of the delay. *See id.* at **16-18. The court found that the first, second, and third factor weighed against the State and the fourth factor--the most important factor--weighed against the defendant. *See id.* The court ultimately concluded:

> After applying the *Barker* balancing test, we agree with the post-conviction court and conclude that the Petitioner has failed to establish by clear and convincing evidence that third counsel was ineffective in refusing to file a motion asserting his rights to a speedy trial had been violated. Although the lack of due diligence by the State was not appropriate, the delay in the proceedings was not unreasonable given the complexity and seriousness of the case. Further, the Defendant failed to establish any prejudice to his defense as a result of the delay.

*Hollis*, 2017 WL 588204, at **16-18.

In agreeing with the post-conviction court that trial counsel was not ineffective, the Tennessee Court of Criminal Appeals determined that the State did not violate the petitioner's speedy trial rights primarily because the petitioner had not established that his ability to prepare a defense was hindered by the delay. It necessarily follows that trial counsels could not have performed deficiently when they did not raise the non-meritorious speedy trial argument. In any event, even if counsels' performance was deficient as alleged by the petitioner, the state court's finding that the petitioner had not established prejudice resulting from trial counsels' failure to litigate an alleged violation of the petitioner's right to a speedy trial was not unreasonable. The court found that the delay helped rather than hindered the petitioner's case because the victims' memories had faded. Additionally, the court found that the petitioner had not shown that there is a reasonable probability of a different trial outcome had counsel filed the unsuccessful speedy trial challenge.

Based on the record, the court's decision did not unreasonably apply *Strickland* and was not based on an unreasonable determination of the established facts. Accordingly, the court will deny relief on Claims 1(1) and 2(1).

### 2. Claim 2(3): Trial counsel's failure to object to an alleged double jeopardy violation

The petitioner next contends that third trial counsel's failure to object to the petitioner's second trial on double jeopardy grounds amounts to ineffective assistance of counsel. (Doc. No. 29 at 9). Specifically, the petitioner asserts that the State violated his constitutional right against double jeopardy by trying him on "four (4) identical counts" in a second trial after he was acquitted on all charges in the first trial. (*Id*. at 9-10).

In reviewing the denial of post-conviction relief on appeal, the Tennessee Court of Criminal Appeals stated the applicable law regarding double jeopardy, noting that "the Fifth Amendment's Double Jeopardy Clause . . . provides that no person shall 'be subject for the same offense to be twice put in jeopardy of life or limb.'" *See Hollis*, 2017 WL 588204, at *11 (quoting U.S. Const. amend. V; Tenn. Const. art. 1, § 10). The court continued: "[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence, which it failed to muster in the first proceeding." *Id*. (quoting *Burks v. United States*, 437 U.S. 1, 11 (1978)).

Applying the law to the facts of the case, the court first found that "the post-conviction court and the State misinterpreted the petitioner's argument and focused exclusively on the dates listed in the counts of the presentment, rather than the evidence actually presented at trial." *Hollis*, 2017 WL 588204, at *12. As a result, the court "examine[d] the entire record of that trial to determine whether any one issue necessary to the judgment in the Petitioner's second trial was actually decided in the Petitioner's favor." *Id*. Noting that there was no question that the victims

were under the age of thirteen at the time of the offense and that the perpetrator was the petitioner, the court determined that "the only conceivable issue[s] for the jury to decide was whether the Petitioner digitally penetrated both victims and when this offense occurred." *Id*. at *13.

As to the first outstanding issue, the appellate court recounted the proof adduced at trial supporting a jury finding that the petitioner digitally penetrated both victims and concluded, "[a]fter a careful review of the record, the Petitioner has failed to meet his burden of establishing that the unlawful digital penetration of the victims by him was decisively resolved in his favor." *Id*. As to when the offenses occurred, the court decided that no double jeopardy violation occurred because "the charges in the first trial listed different dates than the charges in the second trial, and therefore, charged distinct offenses" and the evidence adduced at the second trial substantially differed from the evidence adduced at the first trial. *Id*. It necessarily follows, then, that the court reasonably decided that the petitioner did not receive ineffective assistance of trial counsel when counsel failed to object to an alleged double jeopardy violation; as no double jeopardy violation occurred, trial counsel could not have been deficient by failing to object to a double jeopardy violation.

The court finds that the petitioner has not shown that he is entitled to relief on this claim because the appellate court's determination was not contrary to *Strickland*. Neither was the appellate court's ineffective assistance determination based on an unreasonable determination of the facts or an unreasonable applicable of *Strickland's* standards to those facts. Further, the state court's determinations are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary, *see* 28 U.S.C. § 2254(e)(1), which the petitioner has not submitted. The court finds that the appellate court reasonably denied relief on Claim 2(3).

### 3. Claim 2(4): Trial counsel's failure to object to alleged hearsay statements of witnesses Ross and Gomez

The petitioner alleges that trial counsel Smith was ineffective by failing to object to the testimony of Gomez and Ross as inadmissible hearsay. (Doc. No. 29 at 10). He insists that the statements of the nurse and the social worker were "testimonial" and not made for the purpose of medical diagnosis and treatment. (*Id*.)

In considering this claim, the Tennessee Court of Appeals set forth the law governing hearsay in Tennessee. *See Hollis*, 2017 WL 588204, at **18-19. After reviewing the trial record, the court agreed with the post-conviction court that trial counsel was deficient in not objecting to the hearsay testimony but the petitioner had not established prejudice because the hearsay testimony would have been admitted as witness testimony under state evidentiary law "pursuant to Rule 803(4), for purposes of medical diagnosis and treatment." *Id*. at *20. Thus, since the statements would have been admitted whether counsel made a hearsay objection or not, the appellate court concluded that the petitioner suffered no *Strickland* prejudice by counsel's failure to object to the hearsay testimony.

The court finds that the state court's determination was not "contrary to" *Strickland* or based on an unreasonable determination of the facts or an unreasonable application of *Strickland's* standards to those facts. *See* 28 U.S.C. §§ 2254(d). The appellate court held that, even if counsel had objected to the statements of Ross and Gomez as hearsay, the statements would have been admitted for purposes of medical diagnosis and treatment for three reasons: the victims' statements described specific sex acts that the petitioner forced upon them, the statements were not "inappropriately influenced by another or in response to suggestive or leading questions[,]" and no "other factors that might affect the trustworthiness of the statements" were present. *See Hollis*, 2017 WL 588204, at *20. Thus, the appellate court reasonably decided that the petitioner

suffered no prejudice when counsel failed to make the hearsay objection. The petitioner is not entitled to relief on Claim 2(4) and it will be dismissed.

The petitioner further claims these statements were admitted at trial in violation of the Confrontation Clause. (Doc. No. 29 at 10). In response, the respondent contends that the petitioner has waived his Confrontation Clause claim because he did not identify the Confrontation Clause as a basis for relief in the post-conviction court, he failed to mention the Confrontation Clause in his initial petition, and he failed to list it in his amended petition as a basis for challenging Gomez's and Ross's testimony. The Tennessee Court of Criminal Appeals agreed, holding

> In resolving this issue, the State correctly notes that the Petitioner failed to include the Confrontation Clause as a ground for relief before the post-conviction court. In its order denying relief, the post-conviction court noted that "the issue of denial of confrontation under *Crawford v. Washington*, 541 U.S. 36 (2004) was not addressed by Petitioner and this Court renders no opinion thereon." The Petitioner is not permitted to argue this ground for relief for the first time in this appeal. Therefore, it is waived.

*Hollis*, 2017 WL 588204, at *19. The court agrees with the respondent that this claim is procedurally defaulted. The petitioner has failed to establish cause and prejudice for excusing his default. Accordingly, Claim 2(4) will be dismissed.

### 4. Claim 2(5): Trial counsel's failure to object to an alleged instance of prosecutorial misconduct

The petitioner next alleges that counsel was ineffective by failing to object to "the prosecutorial misconduct of the Assistant District Attorney which denied petitioner a fair trial and due process pursuant to the US Constitution." (Doc. No. 29 at 10). The respondent maintains that the petitioner's vague and conclusory allegation fails to sufficiently elaborate on the specifics of the underlying instance of prosecutorial misconduct and thus warrants the claim's summary dismissal. (Doc. No. 22 at 16-17). However, the respondent alleges that, if the court construes the claim to be a properly exhausted *Strickland* claim regarding counsel Smith's failure to object

to the prosecutor's allegedly improper presentation of the petitioner's escape charge at trial, the petitioner is still not entitled to relief. (*Id.*)

In analyzing a claim of prosecutorial misconduct based on trial counsel Smith's failure to object to the prosecutor's allegedly improper presentation of the petitioner's escape charge at trial, the Tennessee Court of Criminal Appeals agreed with the post-conviction court that the petitioner failed to carry his burden on this claim. The court continued:

> As noted by the State, the record shows that the Petitioner was charged with escape because he did not return to the jail after being dropped off at the VA hospital by an Assistant Public Defender. More significantly, the record shows that prior to each of the Petitioner's trials, third counsel filed a motion in limine to prevent the State from mentioning the escape charge. The trial court limited the State to introducing only the facts supporting the escape offense and prohibited any mention of the actual escape charge. The Petitioner does not reference in the record where the prosecution makes excuses for the victims' grandmother's inconsistent testimony nor does he say how he was prejudiced by this issue. We therefore consider this aspect of his issue waived. The Petitioner has failed to establish deficient performance or prejudice in regards to this issue. He is not entitled to relief.

*Hollis*, 2017 WL 2017 WL 588204, at *20.

The Tennessee Court of Criminal Appeals found that the petitioner failed to establish both deficient performance and prejudice after observing that trial counsel had filed a motion in limine to prevent the prosecution from mentioning the petitioner's escape charge. The trial court partially granted the motion in limine and limited the prosecutor to "introducing only the facts supporting the escape charge[.]" *Hollis*, 2017 WL 588204, at *20. The appellate court also observed that the petitioner failed to reference the prosecutor's misconduct in the record and failed to show how the petitioner was prejudiced by the prosecutor's alleged misconduct. *See id.*

Based on the record before the state court, the court finds that Tennessee Court of Criminal Appeals reasonably denied relief on this claim, and the decision did not constitute an unreasonable

application of *Strickland* and was not based on an unreasonable determination of the established facts.   The petitioner is not entitled to relief on Claim 2(5).

### 5.       Claim 2(6):  Trial counsel's failure to object to "unusual" timing of trial

The petitioner alleges that trial counsel provided ineffective assistance of trial counsel when she failed to object to the petitioner's trial beginning late on a Friday evening and continuing into Saturday morning.  (Doc. No. 29 at 10).

In addressing this claim, the Tennessee Court of Criminal Appeals began by noting that the presentation of evidence in the defendant's trial began "sometime after 7:39 pm on a Friday" and, near the close of the proof, the jury was called back into court to hear an affidavit from the Assistant Public Defender read into evidence at 10:52 p.m.  *Hollis*, 2017 WL 588204, at **20-21. The attorneys gave their closing arguments, the judge charged the jury, and the case was submitted to the jury.  The jury returned its verdict at 12:23 a.m.  *See id.*

The post-conviction court found, and the appellate court agreed, that the petitioner had failed to present any proof on this claim. Because the petitioner had established neither deficient performance of counsel nor prejudice to the defendant as a result of counsel failing to object to the Friday evening start time, the state court denied relief.  In light of the petitioner's failure to present any proof of deficient performance of counsel or prejudice to the defendant, the appellate court's decision on this claim did not unreasonably apply *Strickland* and was not based on an unreasonable determination of the established facts.  The petitioner is not entitled to relief on Claim 2(6).

### 6.       Claim 2(7):  Trial counsel's  failure to require the State to elect offenses prior to the case's submission to the jury at trial

Next, the petitioner alleges that trial counsel provided ineffective assistance of counsel when she did not require the State to elect offenses prior to the case's submission to the jury at trial.  (Doc. No. 29 at 10).   The respondent insists that trial counsel could not have been

constitutionally compelled to raise election as an issue, and, even if she had, there is no reasonable probability that the outcome of the trial would have been different. (Doc. No. 22 at 18).

The appellate court began its review of this claim by setting forth the law pertaining to the election of remedies:

> In *State v. Adams*, the Tennessee Supreme Court stressed the importance of election and reasoned as follows:
>
>> This Court has consistently held that when the evidence indicates the defendant has committed multiple offenses against a victim, the prosecution must elect the particular offense as charged in the indictment for which the conviction is sought." *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999) (citing *Tidwell v. State*, 922 S.W.2d 497 (Tenn. 1996); *State v. Shelton*, 851 S.W.2d 134 (Tenn. 1993); *Burlison v. State*, 501 S.W.2d 801 (Tenn. 1973)). This election requirement serves several purposes. First, it ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense. *Brown*, 992 S.W.2d at 391; *Burlison*, 501 S.W.2d at 803. This right to a unanimous verdict has been characterized by this Court as "fundamental, immediately touching on the constitutional rights of an accused . . . ." *Burlison*, 501 S.W.2d at 804.

24 S.W.3d 289, 294 (Tenn. 2000); *see also State v. Knowles*, 470 S.W.3d 416, 423 (Tenn. 2015) (quoting *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994)). The court in *Adams* also outlined the situations in which an election of offenses is unnecessary:

> When the evidence does not establish that multiple offenses have been committed, however, the need to make an election never arises. To this end, this Court has made a distinction between multiple discrete acts that individually constitute separate substantive offenses and those offenses that punish a single, continuing course of conduct. In cases when the charged offense consists of a discrete act and proof is introduced of a series of acts, the state will be required to make an election. In cases when the nature of the charged offense is meant to punish a continuing course of conduct, however,

election of offenses is not required because the offense is, by definition, a single offense.

*Id.* (emphasis added). In addition, "[w]here the State presents evidence of numerous offenses, the trial court must augment the general jury unanimity instruction to insure that the jury understands its duty to agree unanimously to a particular set of facts." *State v. Hodge*, 989 S.W.2d 717, 721 (Tenn. Crim. App. 1998). Failure to issue a jury instruction on election to insure unanimity constitutes reversible error. *Id.*

*Hollis*, 2017 WL at 588204, at *9.

Applying the law to the facts of the petitioner's case, the Tennessee Court of Criminal Appeals agreed with the post-conviction court that trial counsel was not ineffective by failing to require the State to elect offenses prior to the case's submission to the jury at trial. *See id.* at *10. First, the court found that failure to elect in the petitioner's first trial did not amount to error because that trial ended in an acquittal. *See id.* Next, the court held that the petitioner did not object to the generalized nature of the victim's testimony during that trial and, even had there been such an objection, it would not have been sustained as error on appeal. *See id.*

As to the election issue in the second trial, the Tennessee Court of Criminal Appeals concluded that trial counsel was not ineffective because the indictment was date-specific, the grandmother's testimony was date-specific, and the jury instructions from the trial court on the charged offenses were date-specific. *See id.* Alternatively, the court held, although the jury did not receive a modified unanimity instruction, any error in failing to require an election in this case was harmless beyond a reasonable doubt. *See id.*

The Tennessee Court of Criminal Appeals applied state law governing election of offenses and decided that election was unnecessary; thus, trial counsel could not have provided ineffective assistance of counsel by failing to require the State to elect offenses prior to the case's submission to the jury. The appellate court reasonably concluded that the petitioner failed to establish deficient

performance and prejudice because, if trial counsel had objected to the lack of election, the objection would not have succeeded or changed the outcome of the petitioner's trial.

As to the petitioner's claim that third trial counsel, acting as direct appeal counsel, was ineffective in failing to raise this issue in his direct appeal, the Tennessee Court of Criminal Appeals reiterated that the indictment was date specific, which did not require an election in this case. *See id*. The court therefore held that, had third trial counsel raised this issue on appeal, either through a motion for a new trial or as plain error, a reversal of the petitioner's convictions would not have been warranted. *See id*.

The state courts' decisions on this claim did not unreasonably apply *Strickland* and were not based on an unreasonable determination of the established facts. Claim 2(7), therefore, should be dismissed.

### 7.    Claims 3(2) through 3(8): Appellate counsel's deficiencies

The petitioner also alleges that appellate counsel provided ineffective assistance in all of the ways he alleges she provided ineffective assistance as trial counsel. (Doc. No. 29 at 12). The respondent urges the court to deny habeas relief on these claims. (Doc. No. 22 at 19).

The Tennessee Court of Criminal Appeals addressed Claim 3(8) that third counsel, acting as direct appeal counsel, was ineffective in failing to challenge the lack of election of offenses. *See Hollis*, 2017 WL 588204, at *10. The court found:

> We have already concluded that the indictment was date specific, which did not require an election in this case. Accordingly, had third counsel raised this issue on appeal, either through a motion for a new trial or as plan error, a reversal of Petitioner's convictions would not have been warranted.

*Id*.

The appellate court did not unreasonably apply *Strickland* when it denied the petitioner relief on Claim 3(8). The court already had decided that Smith did not provide ineffective

assistance of trial counsel when she failed to challenge the lack of election of offenses because election was unnecessary. Therefore, this claim would not have provided appellate relief if Smith had raised the issue on direct appeal because election of offenses was unnecessary under state law. The court finds that the appellate court's decision neither contradicted nor unreasonably applied *Strickland* under these circumstances and was not based on an unreasonable determination of the established facts. The petitioner is not entitled to relief on Claim 3(8).

The Tennessee Court of Criminal Appeals did not provide specific reasons for its denial of Claims 3(2) through 3(7). Although the Tennessee Court of Criminal Appeals summarily denied the claims, the AEDPA does not require the appellate court to provide reasons for denying each claim. *See Harrington v. Richter*, 562 U.S. 86, 98 (2011). As long as the petitioner properly raised the claim to the state appellate court, a presumption that the claim was adjudicated on its merits exists unless the record shows that the state court invoked state procedural law to dispose of the claim. *See id*. at 99-100. Here, the petitioner has not rebutted the presumption that Claims 3(2) through 3(7) were adjudicated on the merits, and the Tennessee Court of Criminal Appeals did not invoke any state procedural law to bar relief on these claims. Thus, the court finds that the Tennessee Court of Criminal Appeals adjudicated Claims 3(2) through 3(7) on the merits.

"Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington,* 562 U.S. at 98. The petitioner here has not met this burden. The Tennessee Court of Criminal Appeals cited and applied *Strickland* throughout its opinion to each of the specific allegations of ineffective assistance of trial counsel. It was not necessary for the appellate court to evaluate each of the specific allegations of ineffective assistance of appellate counsel individually because the appellate court already had evaluated the same factual predicates

as ineffective assistance of trial counsel claims and denied relief. *See Hollis*, 2017 WL 588204, at

\*\*8-22. The state court's reasoning on each of the ineffective assistance of trial counsel claims

logically disposes of Claims 3(2) through 3(7). *See Howard v. Bouchard*, 405 F.3d 459, 485 (6th

Cir. 2005) ("Because we find that no prejudice attended trial counsel's errors, we also find that

Petitioner was not prejudiced by any failure on the part of appellate counsel to raise the due process

challenge on appeal."). The court finds that the Tennessee Court of Criminal Appeals' decision

was neither contrary to established law or contrary to the facts of the case. The petitioner is not

entitled to relief on Claims 3(2) through 3(8).

### 8. Claim 1(3): Trial counsels' failure to obtain the trucking log

Claim 1(3) alleges that trial counsels Lockert and Kavanagh provided ineffective assistance

of counsel when they failed to obtain the trucking log to prove the petitioner's alibi. (Doc. No. 29

at 7). The respondent contends that this claim is procedurally defaulted because the petitioner

failed to properly exhaust the factual contentions in state court on either direct or post-conviction

appellate review. (Doc. No. 22 at 28).

However, a review of the record establishes that this claim was raised and litigated in both

the post-conviction court and on appeal of the denial of post-conviction relief. On appeal from

the denial of his petition for post-conviction relief, the petitioner insisted that his 2001 employment

records would have confirmed that he was at work out of state as an on the road truck driver at the

time of the offenses. *Hollis*, 2017 WL 588204, at \*5. The Tennessee Court of Criminal Appeals

considered the claim in conjunction with the petitioner's speedy trial claim and reasoned as

follows:

> Here, the Petitioner argues that the seven-year-delay in his case caused prejudice to
> him by impairing his defense. Specifically, he asserts that he was unable to obtain
> his employment records to establish his alibi or that he was not in Dickson at the
> time the offenses were alleged to have occurred. He further generally contends that

witness memories diminished and that he was prohibited from effectively cross-examining them. We agree with the post-conviction court and conclude that the Petitioner has failed to establish any such prejudice. First, as early as 2001, the TBI requested the Petitioner's employment records as part of their investigation and were advised that they did not exist at that time. As pointed out by the post-conviction court, the fundamental flaw in the Petitioner's argument is that he did not put forth any proof as to whether these records ever existed or when they may have existed. Moreover, as the proof from both of the Petitioner's trials demonstrates, the Petitioner clearly received the benefit of the child victims' faded memories in this case. To be clear, Victim B could not remember the Petitioner's name, much less any specifics about the offense. As we see it, the delay helped rather than hindered the Petitioner's case. Based on the record, we cannot conclude that the Petitioner's ability to prepare a defense was impeded by the delay.

*Hollis*, 2017 WL 588204, at *18. Because the petitioner properly exhausted the claim in the state courts, it is reviewable by this court under the AEDPA's deferential standards. *See* 28 U.S.C. § 2254(b)(1)(A).

The petitioner maintains that his 2001 employment records would have confirmed that he was working out of the state at the time of the offenses. However, the record shows that the trucking logs were unavailable from as early as 2001, when the petitioner was indicted; likewise, the records were unavailable at the time of the petitioner's trial in 2010. Consequently, the petitioner cannot prove that Lockert and Kavanagh were ineffective by failing to obtain the petitioner's trucking logs because the records were unavailable from as early as 2001 and, in any event, Lockert and Kavanagh followed up on the records prior to trial and discovered that they no longer existed. Because the appellate court's ineffective assistance determination was not contrary to clearly established Supreme Court law, based on an unreasonable determination of the facts, or the result of an unreasonable application of clearly established law to the facts, Claim 1(3) must be denied.

9.      **Claim 2(10): Trial counsel's failure to investigate the law regarding speedy trial motions**

The petitioner alleges that trial counsel provided ineffective assistance when she "failed to properly investigate controlling law on filing [a] speedy trial motion." (Doc. No. 29 at 10). The respondent contends that this claim is procedurally defaulted. (Doc. No. 22 at 28).

However, the record establishes that this claim was raised and litigated in both the post-conviction hearing and on appeal. The post-conviction court ruled that the petitioner's speedy trial claim was without merit; therefore, counsel could not have been ineffective for failing to file a motion to dismiss on that ground. (Doc. No. 21, Attach. 21 at 24). In reviewing the denial of post-conviction relief on this claim, the Tennessee Court of Criminal Appeals agreed, finding:

> After applying the *Barker* balancing test, we agree with the post-conviction court and conclude that the Petitioner has failed to establish by clear and convincing evidence that third counsel was ineffective in refusing to file a motion asserting his rights to a speedy trial had been violated. Although the lack of due diligence by the State was not appropriate, the delay in the proceedings was not unreasonable given the complexity and seriousness of the case. Further, the Defendant failed to establish any prejudice to his defense as a result of the delay.

*Hollis*, 2017 WL 588204, at *18.

The Tennessee Court of Criminal Appeals' decision was not contrary to clearly established Supreme Court law, based on an unreasonable determination of the facts, or the result of an unreasonable application of clearly established law to the facts. The petitioner could not establish either deficient performance of counsel or prejudice based on counsel's failure to "properly investigate controlling law on filing [a] speedy trial motion" because the State did not violate the petitioner's right to a speedy trial. The petitioner is not entitled to relief on Claim 2(10).

### 10. Claims 9 and 10: Failures of post-conviction trial counsel and post-conviction appellate counsel

The petitioner claims ineffective assistance of counsel based on the performance of both post-conviction trial and post-conviction appellate counsel in Claims 9 and 10 respectively. (Doc. No. 29 at 25-29). The respondent contends that Claims 9 and 10 are not cognizable in this habeas

proceeding because the petitioner does not possess a right to effective assistance of counsel on state collateral review.  (Doc. No. 22 at 34).

Indeed, there is no constitutional right to an attorney in state post-conviction proceedings. *Coleman*, 501 U.S. at 752 (citing *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987)); *Lynn v. Donahue*, No. 1:14-cv-01284, 2017 WL 5930304, at *10 (W.D. Tenn. Nov. 30, 2017) (dismissing habeas claims based on alleged ineffective assistance of post-conviction attorneys).  Under § 2254(i), the ineffective assistance of post-conviction counsel "shall not be a ground for relief in a proceeding arising under section 2254." 28 U.S.C. § 2254.  Consequently, the petitioner cannot claim constitutionally ineffective assistance of counsel in state post-conviction proceedings. *See Wainwright v. Torna*, 455 U.S. 586 (1982) (where there is no constitutional right to counsel there can be no deprivation of effective assistance).   Claims 9 and 10, therefore, must be dismissed as non-cognizable in this habeas proceeding.

### 11.    Claims 1(2) and 2(8):  Trial counsel's failure to investigate and develop a defense strategy

The petitioner alleges that trial attorneys Lockert, Kavanagh, and Smith were ineffective because they "failed to investigate the facts and circumstances of the case to develop all possible defenses." (Doc. No. 29 at 7).   The respondent contends that these claims are procedurally defaulted because the petitioner failed to properly exhaust each of these factual contentions in state court on either direct or post-conviction appellate review. The respondent further contends that *Martinez* does not apply to excuse the defaults of these ineffective assistance of trial counsel claims because *Martinez* only applies if a defaulted ineffective assistance of trial counsel claim is "substantial," meaning that it has "some merit."   *Martinez*, 566 U.S. at 14.  According to the respondent, each defaulted ineffective assistance of trial counsel claim lacks substantiality.

The petitioner did not raise these claims in his petition for post-conviction relief and has never presented the claims to any state court. The time for raising the claims in the state courts has passed. *See* Tenn. Code Ann. § 40-30-106(g); Tenn Code Ann. §§ 40-30-102(a), (c) (setting one-year limitations period for post-conviction relief). He is now barred by the post-conviction statute of limitations and restrictions on successive state petitions from raising them at this time. The petitioner cannot now return to the state courts to properly exhaust this allegation of ineffective assistance due to the expiration of the state statute of limitations on post-conviction actions and the "one petition" limitation on post-conviction actions. *See* Tenn. Code Ann. § 40-30-102(a) (statute of limitations); *id.* § 40-30-102(c) (one petition for state post-conviction relief). Therefore, the petitioner has procedurally defaulted this claim.

Because the petitioner has never fully and fairly presented Claims 1(2) and 2(8) to the state courts, and a state procedural rule prohibits the state court from extending further consideration to them, the claims are deemed exhausted (since there is no "available" state remedy) but procedurally defaulted from federal habeas review. *See Coleman*, 501 U.S. at 752-53.

The petitioner does not acknowledge his default of these claims and does not argue cause to excuse the default. Because the petitioner has not offered any basis to excuse the default, these claims are not subject to further review and will be dismissed.

### 12. Claim 1(4): Trial counsels' failure to challenge an alleged instance of prosecutorial misconduct

The petitioner contends that trial attorneys Lockert and Kavanagh provided ineffective assistance by failing to "challenge, object to or preserve for appellate review the Prosecutorial Misconduct of Assistant District Attorney Crouch who filed a motion for continuance on May 5th, 2009 that contained lies, half-truths and misleading statements concerning petitioner's whereabouts and when the state first became aware of petitioner's location and circumstances."

(Doc. No. 29 at 7).  The respondent contends that these claims are procedurally defaulted because the petitioner failed to properly exhaust each of these factual contentions in state court on either direct or post-conviction appellate review.   The respondent further contends that *Martinez* does not apply to excuse the defaults of these ineffective assistance of trial counsel claims because *Martinez* only applies if a defaulted ineffective assistance of trial counsel claim is "substantial," meaning that it has "some merit."  *Martinez*, 566 U.S. at 14.  According to the respondent, each defaulted ineffective assistance of trial counsel claim lacks substantiality.

On post-conviction, the petitioner argued that counsel was ineffective for failing to object to the alleged prosecutorial misconduct of intentionally misleading the jury about the petitioner's escape charge and "making excuses" for discrepancies in witness testimony. *Hollis*,  2017 WL *21.  The Tennessee Court of Criminal Appeals agreed with the post-conviction court that the petitioner failed to carry his burden on this claim, finding "[t]he Petitioner has failed to establish deficient performance or prejudice in regards to this issue." *Id.*

However, this claim is distinct from the petitioner's instant claim that counsel was ineffective for failing to object to the alleged prosecutorial misconduct regarding a motion for a continuance.  Therefore, the petitioner did not raise Claim 1(4) in his petition for post-conviction relief and has never presented the claim to any state court.   The time for raising the claim in the state courts has passed.  *See* Tenn. Code Ann. § 40-30-106(g); Tenn Code Ann. §§ 40-30-102(a), (c) (setting one-year limitations period for post-conviction relief).  The petitioner therefore is now barred by the post-conviction statute of limitations and restrictions on successive state petitions from raising them at this time.

Because the petitioner has never fully and fairly presented Claim 1(4) to the state courts, and a state procedural rule prohibits the state court from extending further consideration to the

claim, the claim is deemed exhausted (since there is no "available" state remedy) but procedurally defaulted from federal habeas review. *See Coleman*, 501 U.S. at 752-53.

The petitioner does not acknowledge his default of this claim and does not argue cause to excuse the default. Because the petitioner has not offered any basis to excuse the default, this claim is not subject to further review. Claim 1(4) will be dismissed.

### 13. Claim 2(9): Trial counsel's failure to request funding for an expert witness

Next, Claim 2(9) alleges that trial counsel Smith was ineffective for failing to request funding from the trial court to hire an expert witness to rebut Ross's testimony. (Doc. No. 29 at 10). The petitioner did not raise Claim 2(9) in his petition for post-conviction relief and has never presented the claim to any state court. The time for raising the claim in the state courts has passed. *See* Tenn. Code Ann. § 40-30-106(g); Tenn Code Ann. §§ 40-30-102(a), (c) (setting one-year limitations period for post-conviction relief). The petitioner therefore is now barred by the post-conviction statute of limitations and restrictions on successive state petitions from raising them at this time.

Because the petitioner has never fully and fairly presented Claim 2(9) to the state courts, and a state procedural rule prohibits the state court from extending further consideration to the claim, the claim is deemed exhausted (since there is no "available" state remedy) but procedurally defaulted from federal habeas review. *See Coleman*, 501 U.S. at 752-53.

The petitioner does not acknowledge his default of this claim and does not argue cause to excuse the default. Because the petitioner has not offered any basis to excuse the default, Claim 2(9) is not subject to further review and will be dismissed as defaulted.

### 14. Claims 3(1) and 3(9): Appellate counsel's failure to consult with the petitioner regarding his appeal and a challenge to his conviction on actual innocence grounds

The petitioner alleges that he received ineffective assistance from direct appellate counsel Smith when she failed to consult with the petitioner regarding his appeal and when she failed to challenge the petitioner's conviction on actual innocence grounds. (Doc. No. 29 at 12). However, both claims are defaulted because the petitioner failed to exhaust the claims in state court and cannot now pursue proper exhaustion because the state waiver rule precludes proper exhaustion. *See* Tenn. Code Ann. § 40-30-106(g). Further, the petitioner fails to plead sufficient cause and actual prejudice to excuse the defaults as he ignores his defaults by pleading proper exhaustion. (*See* Doc. No. 29 at 13-14). Even if the petitioner had relied on *Martinez* to excuse his procedural default, *Martinez's* equitable exception does not apply to defaulted claims of ineffective assistance of counsel by direct appellate counsel. *See Davila v. Davis*, 137 S. Ct. 2058, 2063 (2017) (holding that *Martinez* exception only applies to excuse post-conviction counsel's ineffectiveness of "a single claim—ineffective assistance of trial counsel . . ." and declining to "extend that exception to allow federal courts to consider a different kind of defaulted claim—ineffective assistance of appellate counsel."); *Young v. Westbrooks*, 702 Fed. App'x 255, 268 (6th Cir. 2017) ("The Court in *Martinez* was clear that its exception only applied (1) during *initial-review* collateral proceedings and (2) to excuse default for claims of ineffective assistance of counsel *at trial*.") (emphasis in original). Therefore, Claims 3(1) and 3(9) will be dismissed with prejudice as procedurally defaulted.

### 15. Claim 2(2): Trial counsel's failure to object to severance of indictment

The petitioner alleges that trial counsel was ineffective by failing to object to the severance of the 80-count indictment into groups of four counts. (Doc. No. 29 at 9). The petitioner raised this claim in his petition for post-conviction relief, and the post-conviction court determined that counsel made an "affirmative tactical decision" in agreeing to the severance and that she agreed to

the severance to prevent prejudice to the petitioner from the jury's learning that he had been charged with eighty counts of sexual abuse. *Hollis*, 2017 WL 588204, at *21. The post-conviction court found that there was no proof in the record showing that counsel did not prepare adequately for trial and determined that her strategy was "sound" and would have been "ineffective" had she not sought the severance. *See id.*

In reviewing the denial of post-conviction relief on this claim, the Tennessee Court of Criminal Appeals set forth the law governing severance of offenses in Tennessee:

> A defendant has an absolute right to severance of offenses that have been permissively joined pursuant to Tennessee Rules of Criminal Procedure 8(b)(2) unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the state's case-in-chief upon the trial of the other(s). Tenn. R. Crim. P. 14(b)(1); Advisory Commission Cmts. *See Spicer v. State*, 12 S.W.3d 438 (Tenn. 2000) (discussing consolidation versus severance of offenses and holding that trial court's consolidation of indictments over defendant's objection was harmless error); *see also State v. Hallock*, 875 S.W.2d 285, 289–90 (Tenn. Crim. App. 1993) (noting that "[f]ailure to sever ... invited reliance upon the 'propensity' notion: that is, if he did it to one, he did it to the other" but holding that trial court's failure to sever sex offense was harmless error).

*Hollis*, 2017 WL 588204, at *21. The appellate court then applied the law to the facts of the petitioner's case and agreed with the post-conviction court that the petitioner failed to demonstrate that counsel was ineffective by agreeing to the severance in this case. *See id.* The court disagreed with the petitioner that his offenses should have been mandatorily joined and consolidated in a single trial. *See id.* The court explained:

> To the extent that the Petitioner argues that these offenses should have been mandatorily joined and consolidated in a single trial, we disagree. The mandatory joinder rule applies only to "same conduct" and "same criminal episode" offenses, neither of which are involved in the case sub judice. While we do not agree with subjecting the victims or the Petitioner to twenty trials, the record shows that third counsel was concerned the jury would convict the Petitioner based on the "propensity" notion. She agreed to the severance to prevent the jury from hearing the voluminous counts of sexual offenses in the indictment, which cannot be said to be deficient. *State v. Johnson*, 342 S.W.3d 468, 472 (Tenn. 2011) (noting that

"[b]oth the prosecution's and the defendant's decisions regarding joinder and severance are influenced by a range of practical and tactical factors, including the merits of the individual cases, the readiness of the cases for trial, the defendant's right to a fair trial before an impartial jury (uninfluenced by evidence of other offenses), the cost and delay of multiple trials, and the desire to resolve all the charges with dispatch) (internal citations and quotations omitted)). Under the above law, severance of the counts in the indictment was proper. Accordingly, the Petitioner has failed to demonstrate that third counsel provided deficient performance or that his case was prejudiced as a result. He is not entitled to relief on this issue.

*Id.*

The record shows that counsel agreed to the severance to prevent the jury from hearing that the petitioner was charged with eighty counts of child abuse, a strategic move that likely benefitted the petitioner more than it harmed him. Moreover, even assuming that counsel performed deficiently, the petitioner failed to establish a reasonable probability that, had counsel opted not to sever the charges, the outcome of the petitioner's case would have been different. The Sixth Circuit has instructed that, when "one is left with pure speculation on whether the outcome of [the criminal proceeding] could have been any different, [there is] an insufficient basis for a successful claim of prejudice." *Baze v. Parker*, 371, F.3d 310, 322 (6th Cir.2004), *cert. denied*, 544 U.S. 931 (2005). The court finds that the state court's decision was based on a reasonable determination of the facts and that the state court's application of the *Strickland* factors was reasonable. The petitioner therefore is not entitled to relief on the basis of this claim.

## C.    Claims 4, 5, 6: Speedy Trial, Double Jeopardy, and Confrontation Clause Claims

The petitioner alleges a speedy trial claim, a double jeopardy claim, and a Confrontation Clause claim. (Doc. No. 29 at 14-21). The court cannot reach the merits of these claims, however, because the petitioner's claims are procedurally barred from being considered here.

> In all cases in which a state prisoner has defaulted his federal claims
> in state court pursuant to an independent and adequate state

> procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). When a state court judgment appears to have rested primarily on federal law or was interwoven with federal law, a state procedural rule is an independent and adequate state ground only if the state court rendering judgment in the case clearly and expressly stated that its judgment rested on a procedural bar. *Id*. at 739; *Harris v. Reed*, 489 U.S. 255, 263 (1989). On the other hand, when it does not fairly appear that the state court rested its decision on federal grounds or its decision was interwoven with federal law, the presumption that the decision does not rest on independent and adequate state grounds does not apply. *Coleman*, 501 U.S. at 739.

There are exceptions to this procedural bar, including when the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law or can demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *See Coe v. Bell,* 161 F.3d 320, 329-330 (6th Cir. 1998). The Tennessee waiver rule, Tenn. Code Ann. § 40-30-106(g), constitutes an adequate and independent state procedural ground for denying relief. *See Coe*, 161 F.3d at 331 (holding that court was unable to reach merits of Coe's malice jury instructions claim because claim was procedurally barred due to Coe having waived claim by failing to raise it at trial, on direct appeal, or in his first state post-conviction motion).

The petitioner raised Claims 4, 5 and 6 to the Tennessee Court of Criminal Appeals on post-conviction appellate review. In dismissing the claims on post-conviction appeal, the court invoked the Tennessee waiver rule, Tenn. Code Ann. § 40-30-106(g), and did not reach the merits of the claims. *See Hollis*, 2017 WL 588204, at *22. Thus, federal habeas review of the claims is

barred unless the petitioner can demonstrate that cause and prejudice will excuse the procedural default or that failure to consider the claims will result in a fundamental miscarriage of justice. *See Harris*, 489 U.S. at 262.

As cause to excuse his defaults of Claims 4, 5, and 6, the petitioner states that Smith, acting as his direct appellate counsel, refused to brief the claims to the state courts (*see* Doc. No. 29 at 15, 18, 20) and that her ineffective assistance in failing to raise the claims in the state court excuses the default. The court liberally construes the petition as also alleging that post-conviction counsel was ineffective by failing to challenge appellate counsel's alleged ineffectiveness.

The ineffective assistance of appellate counsel can constitute cause for a procedural default. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). However, an "ineffective-assistance-of-counsel claim asserted as cause for [a] procedural default can itself be procedurally defaulted . . . ." *Id*. Here, the petitioner procedurally defaulted a claim of appellate counsel ineffectiveness by not presenting it to any state court within the time allowed for doing so.

Additionally, the petitioner cannot rely on the alleged ineffective assistance of post-conviction counsel as cause to excuse the default. Under *Martinez*, the ineffective assistance of post-conviction counsel may be cause for a procedural default of a claim of ineffective assistance of trial counsel. 566 U.S. 1, 8. The Supreme Court recently refused to extend *Martinez* to claims alleging the ineffective assistance of appellate counsel. *See Davila v. Davis*, 137 S. Ct. 2058 (2017). In *Davila*, the Court held that the ineffective assistance of post-conviction counsel does not provide cause for the procedural default of an ineffective-assistance-of-appellate-counsel claim. *Id*. at 2065. Accordingly, Claims 4, 5 and 6 will be dismissed as procedurally defaulted.

**D.     Claim 8:  Actual Innocence**

Finally, the petitioner alleges that he is actually and factually innocent of the crimes for which he was convicted and sentenced. (Doc. No. 29 at 23-25). A claim of actual innocence is not itself a constitutional claim but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits. *Herrera v. Collins*, 506 U.S. 390, 404 (1993). The actual innocence exception is very narrow in scope and requires proof of factual innocence, not just legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998). In this case, the petitioner is asserting a freestanding actual innocence claim, that is, a claim of actual innocence that is not used to excuse the procedural default of another claim. Although the Supreme Court has suggested that it may recognize freestanding actual innocence claims in capital cases, *see Herrera*, 506 U.S. at 417, it has not done so in non-capital cases such as this one. Thus, on its face, the petitioner's contention fails to state a claim upon which habeas relief can be granted, as the Supreme Court has never ruled that a freestanding actual innocence claim is cognizable in a non-capital case.

Moreover, the actual innocence exception is only applied in the most extraordinary of cases, as the Sixth Circuit has explained that, "if a habeas petitioner presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup v. Delo*, 513 U.S. 298, 316 (1995)." Thus, the threshold inquiry is whether "new facts raise[ ] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Id.* at 317. To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327. The Court has noted that "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v.*

*United States*, 523 U.S. 614, 623 (1998). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup*, 513 U.S. at 324. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.'" *Id.* at 321.

The petitioner has presented no new credible evidence to suggest that he is actually innocent of the crimes of rape of a child and aggravated sexual battery. Thus, he is not entitled to relief on his actual innocence claim.

## V.     Conclusion

For the reasons set forth herein, the petition filed by Horace E. Hollis seeking relief under § 2254 will be denied, and this action will be dismissed with prejudice. All of the petitioner's claims are either procedurally defaulted or fail on the merits.

The petitioner's motion to reconsider the denial of his motion to appoint counsel (Doc. No. 30) will be denied as moot. However, the petitioner's motion to expedite proceedings (Doc. No. 31) will be granted.

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to

deserve encouragement to proceed further." *Miller–El v. Cockrell,* 537 U.S. 322, 327 (2003). The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Because jurists of reason would not disagree with the resolution of the petitioner's claims, the court will deny a COA.

An appropriate Order will be entered.

ENTER this 27th day of November 2018.

_____
Aleta A. Trauger
United States District Judge